USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 31, 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------X
                              :

VINCENT E. McGANN,               :
                              :
                 Plaintiff,  :       14 Civ. 1585 (KPF)
                              :
           v.               :       OPINION AND ORDER
                              :
CAROLYN W. COLVIN,          :
ACTING COMMISSIONER OF SOCIAL  :
SECURITY,                  :
                              :
                   Defendant.  :
----------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

      Plaintiff Vincent E. McGann filed this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a decision by the Acting Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Supplemental Security Income ("SSI") based on a finding that Plaintiff does not meet the Act's criteria for disability. The parties have filed cross-motions for judgment on the pleadings. As detailed in the remainder of this Opinion, because the Administrative Law Judge (the "ALJ") failed (i) to explain adequately the weight given to the opinion of Plaintiff's treating physician and (ii) to abide by the directives in the Appeals Council's remand order, the Court remands for rehearing.

## BACKGROUND[1]

### A.   Plaintiff's Physical Impairments

Vincent McGann first filed for SSI benefits in December 2008, claiming disability as of September 1, 2007.  (SSA Rec. 212).  His application stated that he was not currently working, that he received food stamps, and that his only sources of income were public assistance and monthly financial aid from his mother.  (*Id.* at 213-14).  McGann based his claim for SSI on alleged seizures, sleep apnea, chronic asthma, hypertension, and anxiety attacks.  (*Id.* at 243, 247).

At his initial SSI hearing, held September 14, 2010, McGann described his typical day as consisting of getting up, going to any doctors' appointments, eating, doing household chores, and watching television or writing poetry. (SSA Rec. 53-54).  He explained to the ALJ that he would experience anxiety attacks "out of nowhere," but that he tried to do as much as possible, because he did not "want to be … just a body there, doing nothing."  (*Id.* at 53).  He stated that he and his fiancée would sometimes go out to eat, to the movies, or over to his fiancée's mother's house.  (*Id.* at 54).  McGann testified that he did not handle his own money; his fiancée helped him to manage his food stamps, and both his fiancée and his mother helped him keep up with his bills, because

---

[1]      The facts contained in this Opinion are drawn from the Social Security Administrative Record ("SSA Rec.") (Dkt. #13) filed by the Commissioner.  For convenience, Plaintiff's supporting memorandum is referred to as "Pl. Br."; Defendant's supporting memorandum as "Def. Br."; and Plaintiff's reply as "Pl. Reply."

his seizure disorder caused him to "forget a lot of things real quickly." (*Id.* at 57).

McGann described his seizures as coming in the form of "staring spells," as opposed to more dramatic grand mal episodes. (SSA Rec. 49, 59). He explained that after having such spells he would have no memory of them. (*Id.* at 59). McGann reported that he had previously left a position as a security guard after having staring spells on the job (*id.* at 49), and that his fiancée would tell him when spells occurred in her presence (*id.* at 59). McGann explained that these seizures affected his short-term memory, causing him to miss appointments and to forget to call people. (*Id.* at 60). In addition to the disruption caused by his seizures, McGann described back pain for which he had a TENS unit,[2] sleep apnea and anxiety that caused him difficulty sleeping, and chronic difficulty breathing in hot temperatures or around strong odors. (*Id.* at 62-63, 65).

## B.    Plaintiff's Work History

McGann's highest level of formal education was the receipt of his GED. (SSA Rec. 42). His most recent employment was with the McQuaid Foundation in 2007, where he served as a youth counselor for at-risk children. (*Id.* at 43-44, 74). McGann reported that he stopped working there because his poor breathing and his anxiety interfered with his ability to walk with the kids. (*Id.*

---

[2]       Transcutaneous electrical nerve stimulation (TENS) is a common form of noninvasive pain treatment involving the use of electrical current, transmitted via electrodes placed on the skin. Josinari M. DeSantana et al., *Effectiveness of Transcutaneous Electrical Nerve Stimulation for Treatment of Hyperalgesia and Pain*, Current Medicine Group (2008), available online at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2746624.

at 45-46).  Prior to working at McQuaid, McGann had held similar counselor positions, in 2001 at Pius XII Youth and Family Services and in 2006 at Inward House, each for less than a year.  (*Id.* at 46-47).  For both his McQuaid and Inward House counselor positions, McGann described much of the job as consisting of paperwork.  (*Id.* at 44, 47).  McGann stated that he left his position at Inward House due to trouble with his breathing.  (*Id.* at 77).

In addition to his work with youth, McGann has experience with counseling homeless individuals, having worked at a facility called "Camp LaGuardia" for Volunteers of America.  (SSA Rec. 50).  And separate and apart from his various counseling positions, McGann described having worked briefly as a security guard, but testified that he had left the position after having seizures on the job.  (*Id.* at 48-49, 85-86).

## C.    Plaintiff's Medical Evaluations

### 1.    Crystal Run Healthcare

McGann received treatment at Crystal Run Healthcare from September 2007 through May 2009, from four different doctors: Dr. Stephen K. Grundfast, Dr. Eric W. Barbanel, Dr. David A. Jaeger, and Dr. Zewditu Bekele Arcuri. (SSA Rec. 338-95, 405-23, 480-524, 546-87).  McGann was diagnosed with a list of chronic problems, including anxiety, sleep apnea, shortness of breath, back pain, hypertension, and seizure disorder.  (*Id.* at 382, 410, 558).  On February 12, 2009, McGann complained to Dr. Barbanel that he had recently been forgetful and did not recall having had an appointment two weeks prior. (*Id.* at 555).  That same day, McGann saw Dr. Jaeger, a neurologist, who noted

4

that "McGann may be having complex partial seizures.  Will check EEG and

then refer for second neurological opinion to Dr. Bekele [Arcuri], given her

expertise in epilepsy."  (*Id.* at 560).

Dr. Bekele Arcuri saw McGann on March 26, 2009.  (SSA Rec. 552).  She

noted that he was a "poor historian" and that he apparently had been doing

well on his seizure medication, Dilantin, until he was non-compliant.  (*Id.*).

She further noted McGann's reported memory troubles, which he described as

"progressively getting worse" and which he worried "might be due to [a]

different type of seizure."  (*Id.*).  Dr. Bekele Arcuri expressed doubt that

memory problems were "due to ictal events," but "[could not] definitely [rule

out] partial seizures" and would proceed with the pending EEG.  (*Id.* at 554).

An EEG recorded over a period of 26 minutes and reviewed by Dr. Bekele

Arcuri read as normal, though she noted that "[i]f there is a high clinical

suspicion of seizures, a prolonged awake-asleep EEG is recommended."  (*Id.* at

381).

### 2.    Roberto Rivera, M.D.

Dr. Roberto Rivera performed a consultative examination of McGann on

March 26, 2009.  (SSA Rec. 440-47).  Dr. Rivera described McGann's seizure

disorder as "a very complex one," and noted that McGann reported "grand mal

seizure[s] only every few months, but he state[d] that he gets partial seizures

with absence seizures at least once every day."  (*Id.* at 440).  Dr. Rivera's

physical examination of McGann indicated full flexion of the spine and full

range of motion in the hips, knees, ankles, shoulders, elbows, and wrists.  (*Id.*

at 444).  Dr. Rivera reported that when McGann was asked "to repeat various physical maneuvers rapidly in succession, he found himself getting mildly short of breath, [McGann stated] from his asthma, but he was able to complete them, and, if given a break between exercises, he did absolutely fine." (*Id.*).  Dr. Rivera noted no motor or sensory deficits.  (*Id.*).  He diagnosed McGann with seizure disorder, high blood pressure, panic attacks, heart murmur, asthma, short-term memory loss, and sleep disorder.  (*Id.* at 444-45).  He found that McGann had no restrictions on sitting, standing, walking, or reaching; had mild restrictions on pushing, pulling, and lifting; had moderate restrictions on climbing and bending; and that McGann should "avoid driving and operating heavy machinery due to the unresolved seizure disorder." (*Id.* at 445).

### 3.    Leslie Helprin, Ph.D.

On the same day that McGann saw Dr. Rivera, Dr. Leslie Helprin conducted a consultative psychiatric evaluation.  (SSA Rec. 448).  She described McGann's "manner of relating, social skills, and overall presentation" as "adequate." (*Id.* at 449).  His attention and concentration were "intact" and he recalled "three out of three objects immediately, though none after a five minute time delay.  He repeated seven digits forward and five digits backward." (*Id.*).  Dr. Helprin found that McGann could "follow and understand simple directions and instructions, perform simple rote tasks and some complex tasks independently, maintain attention and concentration, maintain a regular schedule, make appropriate decisions, relate adequately with others, and deal

6

appropriately with stressors." (*Id.* at 451).  She recommended a medical evaluation to determine if McGann's conditions precluded him from working. (*Id.*).

### 4.    R. Gauthier, M.D.[3]

On April 6, 2009, Dr. R. Gauthier reviewed McGann's medical records and submitted a report reflecting his professional assessment of McGann's conditions.  (SSA Rec. 453-55).  He expressed that McGann's medical records did not establish "any ongoing severe [Medically Determinable Impairment], except possibly controlled seizures requiring avoiding hazards." (*Id.* at 454). According to Dr. Gauthier's assessment, McGann's records did not establish a "sever[e] back condition," and the notes from McGann's treating doctor indicated that seizures were controlled.  (*Id.*).

### 5.    Mariano Apacible, M.D.

Psychiatrist Mariano Apacible completed a Mental Residual Functional Capacity Assessment of McGann, based on McGann's medical file, on May 1, 2009.  (SSA Rec. 462-79).  Dr. Apacible noted that McGann's chronic anxiety appeared to be well-controlled, and that McGann's shortness of breath appeared to be related to his anxiety and was "not disabling." (*Id.* at 464).  Dr. Apacible stated that McGann's treating physician's "opinion that [McGann] couldn't work wasn't supported by medical findings," and that McGann could "do work [with] simple tasks as long as he is not working in a small room." (*Id.*).  Dr. Apacible checked boxes on the form to indicate that McGann suffered

---

[3]    The record discloses only the first initial of this medical professional.

from an organic mental disorder and an affective disorder, each a "medically determinable impairment … that does not precisely satisfy the diagnostic criteria" for a listed category of *per se* disabling impairments, though Dr. Apacible left blank the field for "[p]ertinent symptoms, signs, and laboratory findings that substantiate the presence of this impairment." (*Id.* at 467, 469).

### 6.   Neal Dunkelman, M.D.

McGann saw treating physician Neal Dunkelman multiple times during the period from February 2010 to November 2011. (SSA Rec. 530-45, 590-94, 600-05, 615-21). McGann had been referred to Dr. Dunkelman, chiefly for lower back pain. (*Id.* at 537). In February 2010, Dr. Dunkelman's examination indicated no sensory or motor deficits, a negative straight-leg raising test,[4] lumbar flexion of 30 degrees,[5] extension of 10 degrees,[6] and "paralumbar tenderness and spasm." (*Id.*). Dr. Dunkelman noted that McGann was currently taking Vicodin as needed for his back, and proscribed Norco and a trial physical therapy program. (*Id.* at 537-38).

On October 21, 2010, Dr. Dunkelman completed a Residual Functional Capacity questionnaire for McGann, in which Dr. Dunkelman indicated that

---

[4]   A straight-leg raising test is a diagnostic tool for determining whether a patient has spinal nerve root irritation. A positive test indicates likely irritation. *See, e.g.,* Charlie Goldberg, *Musculo-Skeletal Examination*, A Practical Guide to Clinical Medicine (2009), https://meded.ucsd.edu/clinicalmed/joints6.htm (last visited August 31, 2015).

[5]   The normal range of lumbar flexion is approximately 80 to 90 degrees. Social Security Advice Service, *Range of Motion (ROM) Tests*, http://www.ssas.com/disability-medical-tests/musculoskeletal/range-of-motion-test/ (last visited August 31, 2015).

[6]   Normal lumbar extension for individuals age 30-39 is approximately 40 degrees. Normal lumbar extension for individuals age 40-49 is approximately 30 degrees. G. Kelley Fitzgerald et al., *Objective Assessment with Establishment of Normal Values for Lumbar Spinal Range of Motion*, 63 Phys. Ther. 1776, 1779 fig. B (1983).

McGann suffered from "frequent" symptoms "severe enough to interfere with attention and concentration." (*Id.* at 602). He noted a "[m]arked limitation" in McGann's ability to deal with work stress; he further stated that McGann could only walk one-half of a city block without rest, and could sit for no more than 10 minutes and stand for no more than 15 minutes at a time. (*Id.*). He checked a line to indicate that McGann could sit for about two hours and stand or walk for about two hours during a working day, with normal breaks, and circled numbers to indicate that McGann must take three-minute walking breaks approximately every 10 to 15 minutes. (*Id.* at 602-03). He noted significant limitations in repetitive reaching, and indicated that McGann could occasionally lift less than 10 pounds (and could never lift 10 pounds or more). (*Id.* at 604). Under "clinical and objective signs," Dr. Dunkelman noted McGann's two herniated discs. (*Id.* at 601).

### 7. Syed Nasir, M.D.

In August 2010, McGann's primary care physician, Dr. Nedzat S. Kalici, referred McGann to neurologist Syed Nasir. (SSA Rec. 596). Dr. Nasir noted that McGann recounted no seizures in the past year, though he did report staring spells. (*Id.*). Under "neurology" Dr. Nasir wrote "no Seizure" and "no Memory problems." (*Id.* at 597). He additionally noted on the chart, among other things, "no Shortness of breath" and "no Back pain." (*Id.*). He assessed McGann with "[g]eneralized convulsive epilepsy without mention of intractable epilepsy." (*Id.* at 598).

On January 19, 2011, Dr. Nasir wrote a note on a prescription pad stating that "Mr[.] McGann has epilepsy.  It is impacting his short term memory."  (*Id.* at 606, 622).  On August 2, 2012, after McGann was first denied SSI benefits, Dr. Nasir wrote a note addressed "To whom this may concern" stating that "[Vincent] McGann suffers from epilepsy.  It is suspect[ed] that it is poorly controlled.  It impacts his memory and [cognitive] function[s] which are poor.  He has difficulty with concentration.  Treatment is ongoing."  (*Id.* at 641).

### 8.  **Yong Wen, M.D.**

A computerized tomography ("CT") scan of McGann's abdomen and pelvis on July 8, 2011, indicated a high likelihood of polycystic kidney disease.  (SSA Rec. 610, 623).  An abdominal sonogram conducted the following week showed polycystic kidneys, hepatic cysts, a gallbladder polyp, and an enlarged spleen.  (*Id.* at 612-13).  On July 28, 2011, McGann saw Dr. Yong Wen for a consultation regarding these imaging tests and his polycystic kidneys.  (*Id.* at 628).  Dr. Wen reported that McGann's imaging was consistent with Autosomal Dominant Polycystic Kidney Disease ("ADPCKD"), but his report states that McGann was then feeling well and had no specific complaints.  (*Id.*).  No reliable therapy exists for ADPCKD, but McGann was interested in participating in an experimental trial, for which Dr. Wen made the necessary arrangements.  (*Id.* at 629).

On July 25, 2012, Dr. Wen wrote a note stating that McGann had ADPCKD with "moderate[ly] impaired kidney function" and liver cysts.  (SSA Rec. 631).  Dr. Wen further wrote that McGann "may occasionally experience

10

flank pain and back pain when renal cysts are bleeding or become infected."
(*Id.*).

### 9.   Nedzat S. Kalici, M.D.

McGann's primary physician, Dr. Nedzat S. Kalici, filled out a Physical
Residual Functional Capacity Questionnaire for McGann on July 31, 2012.
(SSA Rec. 633-37).  He diagnosed McGann with hypertension, seizure disorder,
asthma, and polycystic kidney disease, though he left the field for "clinical and
objective signs" blank.  (*Id.* at 633).  He noted no pain or other symptoms
severe enough to interfere with attention and concentration, and moderate
limitations on McGann's ability to deal with work-related stress.  (*Id.* at 633-
34).  Dr. Kalici indicated that McGann could continuously sit for only 15
minutes, continuously stand for 15 minutes, and could sit or stand for less
than two hours each during a work day.  (*Id.* at 634-35).  He circled numbers
to indicate that McGann would need to take 25-minute walking breaks
approximately every 20 minutes while at work.  (*Id.* at 635).  Dr. Kalici noted no
limitations on repetitive reaching, and indicated that McGann could bend and
twist at the waist for 75 percent of the work day.  (*Id.* at 636).  Finally, Dr.
Kalici advised that McGann should avoid working around dust, fumes, and
gases.  (*Id.* at 637).

### D.   The ALJ's First Opinion Denying Benefits and the Appeals Council's Remand Order

On November 23, 2010, the ALJ issued a decision finding McGann not
disabled, and consequently denying him SSI benefits.  (SSA Rec. 96-105).

Upon review of the ALJ opinion, the Appeals Council remanded for rehearing, identifying two specific deficiencies in the ALJ opinion:  First, the ALJ failed to weigh the evidence provided by McGann's consultative psychologist or to include relevant evidence regarding cognitive limitations in its residual functional capacity ("RFC") assessment; and second, the ALJ erroneously found McGann had past relevant work.  (*Id.* at 111-12).

The rehearing was held on August 1, 2012 (SSA Rec. 69), at which time McGann testified that he tried to stretch and walk a little each day, and that he was attending monthly meetings of the Masons (*id.* at 81-82).  McGann noted that he had recently been diagnosed with kidney disease, which caused him pain throughout his back, front, sides, and stomach.  (*Id.* at 81-82, 87). McGann reiterated his memory troubles, noting that he would forget to do things such as pick up or call his sons, return phone calls, or keep appointments.  (*Id.* at 88).  He stated that he had no trouble walking around the grocery store, but that while doing so he would have unpredictable panic attacks.  (*Id.* at 90).  On November 16, 2012, the ALJ again denied McGann's application for SSI.  (*Id.* at 17).  The Appeals Council denied a request for rehearing, and McGann filed for review in this Court on March 7, 2014.

## E.    The ALJ's Second Opinion Denying Benefits

In her November 16, 2012 opinion, the ALJ found at step one of her analysis that McGann had not engaged in substantial gainful activity since his application date of December 9, 2008.  (SSA Rec. 22 (citing 20 C.F.R. § 416.971

*et seq.*)).[7]  At step two the ALJ further found that McGann suffered from multiple severe impairments, including asthma, sleep apnea, seizure disorder, two herniated discs, obesity, polycystic kidney disease, and anxiety/cognitive disorder.  (*Id.* (citing 20 C.F.R. § 416.920(c))).

The Commissioner has promulgated a list of impairments describing various physical and mental conditions which, if established, create a presumption of disability.  *See* 20 C.F.R. § 404, Subpt. P, App'x 1.  Moving to step three of her inquiry, the ALJ considered whether McGann satisfied the criteria for one or more of these listed impairments, such that he would be presumptively disabled under the Act, and determined that he did not.  (SSA

---

[7]    The SSA employs a five-step analysis for evaluating disability claims.  *See* 20 C.F.R. § 404.1520(a)(1) ("This section explains the five-step sequential evaluation process we use to decide whether you are disabled.").  The Second Circuit has described the five-step analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [*per se*] disabled.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian* v. *Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)).  "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step.  *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

Rec. 22).  In so finding, the ALJ gave a detailed recounting of the evidence in the record from McGann's various physicians.  (*Id.* at 22-23).  The ALJ noted that among the various impairments set forth in Appendix 1 of 20 C.F.R. § 404, Subpart P, she specifically reviewed "section 11.00, which deals with neurological impairments," and found that while the record shows that McGann does have epilepsy, "it is well controlled and therefore does not meet the severity of this listed neurological condition." (*Id.* at 24).  The ALJ similarly found that the requirements of section 6.00 (genitourinary impairments), section 3.00 (respiratory impairments), and section 1.00 (spinal impairments) were not met.  (*Id.* at 25).  Looking to mental impairments, the ALJ found that any limitations McGann suffered did not meet or medically equal the criteria of the "paragraph B" or "paragraph C" mental impairment definitions.  (*Id.*).  As the ALJ explained, "[t]o satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following:  marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (*Id.*).

The ALJ found that, based on the evidence from the hearing and McGann's medical records, McGann had no more than mild limitations in activities of daily life; moderate limitations upon concentration, persistence, and pace; and no limitations on social functioning.  (SSA Rec. 25).  Most importantly, he did not meet the threshold for a "marked difficulty" in any of these areas, which requires that a limitation be "more than moderate but less

14

than extreme." (*Id.*).  The ALJ additionally found that McGann had experienced no episodes of decompensation for extended duration.  (*Id.*).  Because McGann failed to satisfy at least two of the four criteria under paragraph B, he did not have a mental impairment as defined by that section.  (*Id.*).  The ALJ noted, without further discussion, that paragraph C was similarly not satisfied.  (*Id.* at 26).[8]

At the fourth step of her analysis, the ALJ determined that McGann had the RFC to perform light work consisting of unskilled tasks, "with no exposure to respiratory irritants or hazards, [and] with only occasional climbing and bending." (SSA Rec. 26).  In making this determination, the ALJ adhered to a

---

[8]    *See Kohler* v. *Astrue*, 546 F.3d 260, 265-66 (2d Cir. 2008) (citations and footnote omitted):

> In addition to the five-step analysis outlined in 20 C.F.R. § 404.1520, the Commissioner has promulgated additional regulations governing evaluations of the severity of mental impairments. These regulations require application of a "special technique" at the second and third steps of the five-step framework, and at each level of administrative review. This technique requires the reviewing authority to determine first whether the claimant has a "medically determinable mental impairment." If the claimant is found to have such an impairment, the reviewing authority must "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c)," which specifies four broad functional areas: [i] activities of daily living; [ii] social functioning; [iii] concentration, persistence, or pace; and [iv] episodes of decompensation. According to the regulations, if the degree of limitation in each of the first three areas is rated "mild" or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not "severe" and will deny benefits. If the claimant's mental impairment is severe, the reviewing authority will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder. If so, the claimant will be found to be disabled. If not, the reviewing authority will then assess the claimant's residual functional capacity.

prescribed two-step process:  First, she determined whether a medically determinable impairment, physical or mental, could be shown that could reasonably be expected to produce McGann's symptoms.  (*Id*.).  Second, after finding such impairments, the ALJ evaluated the intensity, persistence, and limiting effects of McGann's symptoms to determine the extent to which they limited his functioning.  (*Id*.).  The ALJ explained that "[f]or this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record."  (*Id*.).

Pursuant to this two-step process, the ALJ found that McGann "has alleged multiple impairments, but the medical record does not support a finding that these impairments would, individually or in combination, result in an inability to perform all sustained work activity." (SSA Rec. 26).  Specifically, McGann's seizures were well controlled; CPAP therapy had produced significant improvement in his sleep apnea; no significant treatment corroborated his complaints of asthma and shortness of breath; and he received only conservative treatment for his disc herniations.  (*Id.* at 27).  While McGann's cognitive limitations would confine him to unskilled tasks, the ALJ found a lack of support for his reported memory problems.  (*Id*.).  In sum, the ALJ determined that McGann could perform the requirements of light work, provided he avoided concentrated exposure to respiratory irritants, only

occasionally had to climb or bend, and avoided unprotected heights and dangerous machinery.  (*Id.*).

At step five of her analysis, the ALJ determined that McGann was unable to perform any past relevant work, as his previous drug counseling positions qualified as skilled jobs, and his documented conditions would restrict him to unskilled labor.  (SSA Rec. 27).  Finally, considering McGann's age at the time of his application (38 years), his high-school-level education and fluency in English, his work experience, and his RFC, the ALJ found that jobs existed in significant numbers in the national economy that McGann could perform.  (*Id.* at 28 (citing 20 C.F.R. §§ 416.969, 416.969(a))).

To make this determination, the ALJ had to consider McGann's "residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines."  (*Id.* (citing 20 C.F.R. § 404, Subpt. P, App'x 2)). [9]  If an individual "cannot perform substantially all of the exertional demands of work at a given level [of the Medical-Vocational Guidelines] and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of 'disabled' without considering the additional … limitations."  (*Id.*).  As explanation for her finding that McGann could perform jobs that exist in significant numbers in the national economy, the ALJ stated only that

---

[9]     The Medical-Vocational Guidelines, also called "the grids," are a set of three tables found at 20 C.F.R. § 404, Subpart P, Appendix 2.  Once a claimant's age, education, RFC, and work experience have been determined, the tables can be used to make a determination of "disabled" or "not disabled."

> [i]f the claimant had the residual functional capacity to
> perform the full range of light work, considering the
> claimant's age, education, and work experience, a
> finding of "not disabled" would be directed by Medical-
> Vocational Rule 202.21.   However, the additional
> limitations have little or no effect on the occupational
> base of unskilled light work.  A finding of "not disabled"
> is therefore appropriate under the framework of this
> rule.

(*Id.*).  At the conclusion of her analysis, the ALJ found McGann not disabled as

defined under the Act.  (*Id.* (citing 42 U.S.C. § 1614(a)(3)(A))).

## DISCUSSION

Plaintiff argues for remand on six separate grounds, claiming that the

ALJ (i) failed to consider the combined impact of his impairments; (ii) failed to

apply the correct legal standard in her credibility findings; (iii) incorrectly

applied the law in her determination of his RFC; (iv) misapplied the "Treating

Physician Rule"; (v) erred by failing to employ a vocational expert at the fifth

step of her analysis; and (vi) failed to comply with the order of the Appeals

Council.  (Pl. Br. 14-25).  As the Court discusses below, only two of these

arguments survive an analysis of the record.  However, because the ALJ failed

to explain the weight she gave to the report of McGann's treating physician and

to follow the express directive of the Appeals Council, the Court remands for

rehearing.

## A.   Applicable Law

### 1.   Motions under Federal Rule of Civil Procedure 12(c)

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings

are closed — but early enough not to delay trial — a party may move for

18

judgment on the pleadings." Fed. R. Civ. P. 12(c).  The standard applied to a motion for judgment on the pleadings is the same as that used for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Sheppard* v. *Beerman*, 18 F.3d 147, 150 (2d Cir. 1994); *accord L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).  When considering either type of motion, a court should "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).

### 2. Review of Determinations by the Commissioner of Social Security

In order to qualify for disability benefits under the Act, a claimant must demonstrate his "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see*

*also Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  The claimant must also establish that the impairment is "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  Further, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Id.* § 423(d)(3).

In reviewing the final decision of the Social Security Administration, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  A court must uphold a final SSA determination to deny benefits unless that decision is unsupported by substantial evidence or is based on an incorrect legal standard.  *Selian*, 708 F.3d at 417 ("In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." (quoting *Talavera*, 697 F.3d at 145)); *see also* 42 U.S.C. § 405(g) ("If there is substantial evidence to support the determination, it must be upheld.").  Furthermore, where the findings of the SSA are supported by substantial evidence, those findings are "conclusive."  *Diaz* v. *Shalala*, 59 F.3d 307, 312 (2d Cir. 1995) ("The findings of the Secretary are conclusive unless they are not supported by substantial evidence." (citing 42 U.S.C. § 405(g))).

"Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Talavera*, 697 F.3d at 151 (quoting *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971)).  The substantial evidence standard is "a very deferential standard of review — even more so than the clearly erroneous standard."  *Brault* v. *Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted).  To make the determination of whether the agency's finding were supported by substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Talavera*, 697 F.3d at 151 (quoting *Mongeur* v. *Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

Finally, the presiding ALJ has an affirmative obligation to develop the administrative record.  *See Lamay* v. *Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009); *Casino-Ortiz* v. *Astrue*, No. 06 Civ. 155 (DAB) (JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing *Perez* v. *Chater*, 77 F.3d 41, 47 (2d Cir. 1996)).  This means that the ALJ must seek additional evidence or clarification when the "report from [claimant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1).

21

**B.      Analysis**

**1.      The ALJ Considered the Combined Impact of McGann's Impairments**

The first of Plaintiff's contentions, that the ALJ failed to take the combined impact of his impairments into account, can be dispensed with quickly.  "[T]he combined effect of a claimant's impairments must be considered in determining disability; the SSA must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe."  *Dixon* v. *Shalala,* 54 F.3d 1019, 1031 (2d Cir. 1995).  In the instant case, the ALJ adhered to this requirement, taking McGann's multiple impairments into account both individually and in the aggregate.  (*See* SSA Rec. 26 (stating that "the medical record does not support a finding that [McGann's] impairments would, individually or in combination," result in disability, and proceeding to detail the impairments taken into consideration)).  Consequently this argument is without merit and remand is not warranted on this ground.

**2.      The ALJ Properly Assessed McGann's Credibility**

When considering a claimant's symptoms and their impact on the claimant's RFC, the ALJ follows a two-part process:  First, the ALJ must determine whether medically acceptable clinical and laboratory diagnostic techniques establish an underlying physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  20 C.F.R. § 404.1529(a)-(b).  Second, once an underlying physical or mental impairment has been shown, the ALJ must evaluate the intensity, persistence, and limiting

22

effect of the claimant's symptoms to determine the extent to which they limit the claimant's functioning.  20 C.F.R. § 404.1529(c).

When a claimant alleges that his symptoms result in a greater functional restriction than can be demonstrated by objective medical evidence, the ALJ considers evidence such as the claimant's daily activities; the type, dosage, effectiveness, and side effects of medications; treatments or pain relief measures; and other factors.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).  "The ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant."  *McLaughlin* v. *Sec'y of Health, Educ. & Welfare*, 612 F.2d 701, 705 (2d Cir. 1980) (internal quotation marks and citation omitted).  A reviewing court will uphold the ALJ's decision to discount a claimant's subjective complaints, such as complaints of pain, so long as the decision is supported by substantial evidence.  *See Aponte* v. *Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). Moreover, "an ALJ's credibility determination is generally entitled to deference on appeal."  *Selian*, 708 F.3d at 420; *see also Torres* v. *Colvin*, No. 12 Civ. 6527 (ALC) (SN), 2014 WL 4467805, at *4 (S.D.N.Y. Sept. 8, 2014) (collecting cases).

In the instant case, while the ALJ found that McGann's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, she declined to credit his testimony regarding the actual limitations he experienced as a consequence of those impairments.  (SSA Rec. 26-27).  Specifically, she found McGann's assertions regarding symptoms

23

arising from his seizure disorder, sleep apnea, asthma, and back pain to be non-credible.  Considering first the seizures, she stated that "the record indicates and the claimant's testimony corroborates, that his seizures are under control and he is able to live alone and concentrate sufficiently to drive a car and write poetry." (*Id.* at 26).[10]  As to the sleep apnea, the ALJ noted that McGann's records indicate significant improvement with CPAP therapy.  (*Id.*). Regarding his asthma, the ALJ found that the record lacked documentation of the need for emergency room visits, "or even significant treatment for asthma or other chronic pulmonary disease." (*Id.* at 27).  Finally, as to McGann's back pain, the ALJ found that while objective medical evidence supported a diagnosis of disc herniation, McGann had received only conservative treatment, and his "physical and neurological examinations were essentially normal." (*Id.*) Hence, contrary to the Plaintiff's assertions, the ALJ sufficiently considered the record when making her determination regarding the credibility of McGann's statements concerning his symptoms and attendant limitations.

### 3.    The ALJ Correctly Applied the Law in Determining McGann's RFC

Plaintiff alleges that the ALJ misapplied the pertinent law in her determination of his RFC.  (Pl. Br. 23).  This is not the case.  In determining a claimant's RFC, the ALJ must consider those of the claimant's symptoms that

---

[10]    The Court notes for the sake of completeness that while the record does reflect that McGann occasionally drove himself for short distances, he did so in contravention of his physicians' explicit directions.  (SSA Rec. 512 (report from neurologist stating "Told him not to drive; he seemed to understand and agree"), 445 (report from Dr. Rivera advising McGann not to drive due to unresolved seizure disorder)).  Nevertheless, the record sufficiently supports the remainder of the ALJ's rationale that the Court is not troubled by the arguable overstatement of McGann's driving ability.

are supported either by objective medical evidence or by credible statements of the claimant.  20 C.F.R. § 416.929.  In the instant case, the ALJ walked through the evidence relating to McGann's account of his own limitations, finding that his claimed limitations relating to his seizures, sleep apnea, asthma, and back pain were not credible.  (SSA Rec. 26-27; *see also* Discussion Sec. B(2), *supra*).  Furthermore, the ALJ discussed the medical findings of Dr. Rivera, Dr. Dunkelman, and Dr. Kalici, stating any associated objective findings and incorporating those into her assessment.  (SSA Rec. 26-27).  Thus the Court finds that the ALJ correctly applied the law in determining McGann's RFC, notwithstanding his assertions to the contrary.

### 4.   The ALJ Inadequately Explained Her Consideration of Statements from Plaintiff's Treating Physician

Despite the ALJ's application of the correct framework for determining McGann's RFC, her explanation of the weight given to the opinion of at least one of McGann's treating physicians fails to satisfy the so-called "Treating Physician Rule."  Under that doctrine, a treating physician's opinion is given controlling weight to the extent it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).

Where an opinion, of either a treating physician or another physician, is not given controlling weight, an ALJ should consider the following factors in determining how much weight to ascribe to the given opinion: (i) the examining relationship; (ii) the treatment relationship, including the length, nature, and extent of the treatment relationship and the frequency of examination; (iii) the

supportability of the opinion; (iv) the consistency with the record as a whole; (v) the physician's specialization; and (vi) any other relevant factors. 20 C.F.R. § 414.1527(c); *Rosier* v. *Colvin,* 586 F. App'x 756, 758 (2d Cir. 2014) (summary order) (quoting 20 C.F.R. § 404.1527(c)). Finally, opinions as to an ultimate finding of disability are not given controlling weight. *Id.* § 404.1527(d).

In the instant appeal, the ALJ assessed the opinions of two treating physicians, Dr. Dunkelman and Dr. Kalici, assigning little weight to the former and no weight to the latter. (SSA Rec. 27). In regards to Dr. Dunkelman's opinion, the ALJ found that it lacked significant support from objective medical evidence. (*Id.*). Furthermore, the ALJ explained that Dr. Dunkelman's finding that McGann could not perform even sedentary work was "inconsistent with Dr. Dunkelman's own treatment report, which noted negative straight leg raising, a normal gait and no atrophy." (*Id.*). And while a more detailed insight into the ALJ's consideration of Dr. Dunkelman's opinion might have been preferable, the ALJ provided sufficient support for the weight actually assigned to Dr. Dunkelman's report; not only was his report not supported and inconsistent with the record as a whole, but it contradicted his own previous assessment. (*Id.*)

The ALJ's assessment of Dr. Kalici's opinion is similarly close to the line, but this time falls on the other side. The ALJ states simply that

> Dr. Kalici's more recent report of an extremely limited residual functional capacity contains no identified clinical objective signs and is therefore not well supported, except that limitations for bending at the waist would be consistent with a diagnosis of kidney

> disease/abdominal pain.  Overall therefore, the opinion
> of Dr. Kalici is given no weight.

(*Id.* at 27).  As explained *supra*, a treating physician's opinion receives

controlling weight to the extent that it is supported by objective medical

evidence and not inconsistent with other portions of the record.  Thus the

ALJ's failure to assign controlling weight to Dr. Kalici's opinion was not

improper.  However, once an ALJ finds that a treating physician's opinion does

not merit controlling weight, the ALJ must then consider additional factors in

order to determine how much weight the opinion does in fact deserve.  20

C.F.R. § 404.1527(c)(2); *Moss* v. *Colvin*, No. 13 Civ. 731 (GHW) (MHD), 2014 WL

4631884, at *27 (S.D.N.Y. Sept. 16, 2014); *Hartnett* v. *Apfel*, 21 F. Supp. 2d

217, 221 (E.D.N.Y. 1998).  An ALJ need not mechanically walk through the

relevant factors; *some* explanation of the weight assigned to the opinion,

however, is required.  *Garcia* v. *Barnhart*, No. 01 Civ. 8300 (GEL), 2003 WL

68040, at *8 (S.D.N.Y. Jan. 7 2003) ("[T]he regulations state that the

Commissioner 'will always give good reasons in our notice of determination or

decision for the weight we give [the] treating source's opinion'"); 20 C.F.R.

§ 404.1527(c)(2).

Here, the ALJ failed to offer any explanation for her jump from deciding

not to give Dr. Kalici's opinion controlling weight, to giving it no weight at all.

The only commentary the ALJ offered on Dr. Kalici's report was that it was not

sufficiently supported by objective medical evidence, but that takes the

analysis no further than the threshold decision of whether or not a

presumption of controlling weight applies.  Furthermore, the ALJ's reasoning cannot be inferred from the logic of her opinion:  She found Dr. Dunkelman's report to be both inconsistent with the record and unsupported by clinical evidence, and consequently gave it "little weight."  (SSA Rec. 27).  She found Dr. Kalici's opinion to be insufficiently supported by clinical evidence, but at least partially consistent with objective evidence in the record, and assigned it "no weight."  (Id.).

To be clear, the Court understands that the ALJ may have had perfectly valid reasons for assigning weight as she did; the Court's concern is that she did not articulate them sufficiently in the record.  Failure to do so frustrates the Court's ability to conduct meaningful review, and consequently warrants remand.  *See, e.g., Flagg* v. *Colvin,* No. 12 Civ. 644 (GTS/VEB), 2013 WL 4504454, at *6 (N.D.N.Y. Aug. 22, 2013) ("The summary statement that the additional evidence presented by Plaintiff … did 'not provide a basis' for changing the ALJ's decision is insufficient as it frustrates meaningful review by this Court and provides the Plaintiff with no material information to explain why his treating physician's opinion was rejected."); *Moss*, 2014 WL 4631884, at *26 (same).

### 5. Within the Framework of Her Analysis, the ALJ Did Not Err by Failing to Employ a Vocational Expert

"Because [Plaintiff] established that his various impairments prevented him from performing his past work, the ALJ had the burden of proving that [Plaintiff] retained 'a residual functional capacity to perform alternative substantial gainful work which exists in the national economy.'"  *Roma* v.

*Astrue*, 468 F. App'x 16, 20 (2d Cir. 2012) (summary order) (quoting *Bapp* v.

*Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)).  "The ALJ ordinarily meets this

burden by utilizing the applicable medical vocational guidelines, although sole

reliance on the guidelines may be inappropriate where the claimant's exertional

impairments are compounded by nonexertional impairments."  *Id.*

The Second Circuit has held that the presence of nonexertional

impairments does not automatically require the testimony of a vocational

expert; rather, the question is whether "a claimant's nonexertional impairments

'significantly limit the range of work permitted by his exertional limitations.'"

*Bapp*, 802 F.2d at 605 (quoting *Blacknall* v. *Heckler*, 721 F.2d 1179, 1181 (9th

Cir. 1983) (per curiam)); *accord Vargas* v. *Astrue*, No. 10 Civ. 6306 (PKC), 2011

WL 2946371, at *13 (S.D.N.Y. July 20, 2011) (citing *Zabala* v. *Astrue*, 595 F.3d

402, 410 (2d Cir. 2010)).  A nonexertional impairment "'significantly limit[s]' a

claimant's range of work when it causes an 'additional loss of work capacity

beyond a negligible one or, in other words, one that so narrows a claimant's

possible range of work as to deprive him of a meaningful employment

opportunity.'"  *Zabala*, 595 F.3d at 411 (alteration in original) (quoting *Bapp*,

802 F.2d at 605-06).

McGann argues that the ALJ erred by failing to employ a vocational

expert to determine whether jobs existed in significant numbers in the national

economy that he could perform.  (Pl. Br. 24).  However, the failure to obtain the

testimony of a vocational expert — even where some degree of nonexertional

limitation exists — does not necessarily constitute legal error:  Where an ALJ

finds that mild-to-moderate cognitive limitations have a limited impact on the range of unskilled work available to a claimant, courts have been willing to accept an ALJ's reliance on the Medical-Vocational Guidelines.  *See, e.g.*, *Zabala*, 595 F.3d at 411 ("The ALJ found that Petitioner's mental condition did not limit her ability to perform unskilled work, including carrying out simple instructions, dealing with work changes, and responding to supervision.  Thus, her nonexertional limitations did not result in an additional loss of work capacity, and the ALJ's use of the Medical-Vocational Guidelines was permissible."); *Carattini* v. *Colvin*, No. 13 Civ. 7806 (ALC), 2015 WL 1499509, at *12 (S.D.N.Y. Mar. 31, 2015) (upholding an ALJ's determination that a plaintiff's limitation "to understanding, remembering, and carrying out simple, unskilled tasks … [had] little or no effect on the occupational base of unskilled work at all exertional levels"); *see also Martinez* v. *Colvin*, No. 13 Civ. 7254 (KPF), 2015 WL 4041988, at *14 (S.D.N.Y. July 2, 2015) ("Courts have repeatedly accepted reliance on the grids where ALJs found that moderate mental limitations has a limited impact on the range of unskilled sedentary work available" (citation omitted)).  Hence the failure to use a vocational expert was not, in and of itself, error, given the ALJ's finding that McGann had only non-severe cognitive limitations.  (SSA Rec. 28).

### 6.   The ALJ Erred in Failing to Adhere to the Appeals Council's Explicit Directions

While the lack of vocational expert testimony may not itself constitute error, the antecedent determination regarding McGann's cognitive limitations poses more of a problem:  In its remand order, the Appeals Council expressly

states that "the claimant submitted a note from Syed Nasir, M.D., dated January 19, 2011, stating that the claimant's epilepsy is impacting his short-term memory.  This evidence warrants consideration with the other evidence relating to the claimant's cognitive limitations."  (SSA Rec. 111).  While the ALJ recited the existence of the referenced evidence in her step three analysis, her opinion contains no indication concerning the degree to which she considered the note or the weight that she assigned it in determining McGann's RFC.  (*Id.* at 23-28).  On the contrary, despite alluding to the note in a separate section of her opinion, the ALJ all but ignored its existence in her RFC analysis, stating only that McGann's physicians' "treating notes have reported no memory problems."  (*Id.* at 27).  The ALJ's failure to explain what consideration, if any, she gave to Dr. Nasir's note seems to defy the Appeals Council's order to consider it in conjunction with McGann's additional cognitive evidence. Because the ALJ failed to consider the evidence as expressly directed by the Appeals Council, the Court finds remand appropriate.  *See Cabibi* v. *Colvin*, 50 F. Supp. 3d 213, 231 (E.D.N.Y. 2014) (remanding in part for failure to develop the record in compliance with the Appeals Council's direct order); *Savino* v. *Astrue,* Case No. 07 Civ. 4233 (DLI), 2009 WL 2045397, at *10 (E.D.N.Y. July 8, 2009) (holding that remand was required on the basis that the ALJ "ignored the remand order" and "disregarded the Appeals Council's explicit directives" to "use a [vocational expert] to help determine whether [the] plaintiff could perform his past relevant work"); *see also Tauber* v. *Barnhart,* 438 F. Supp. 2d 1366, 1375-76 (N.D. Ga. 2006) (stating that the ALJ erred in failing

to follow the Appeals Council's remand order, which called for, among other directives, consideration of whether the jobs identified as available for the claimant "would allow her to alternate between sitting and standing"); *Thompson* v. *Barnhart,* No. 05 Civ. 395 (GEP), 2006 WL 709795, at *11-12 (E.D. Pa. Mar. 15, 2006) (remanding the case to the ALJ because the ALJ "committed legal error by [*inter alia*] not following the regulations of the Social Security Administration itself which require adherence to remand orders of the Appeals Council"); *Mann* v. *Chater,* No. 95 Civ. 2997 (SS), 1997 WL 363592, at *3 (S.D.N.Y. June 30, 1999) ("The ALJ should have followed the order of the Appeals Council.  Because he did not, I must remand this action." (citation omitted)).

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is GRANTED insofar as it requests remand for rehearing; and Defendant's motion for judgment on the pleadings is DENIED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      August 31, 2015
            New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge